Case No. 13-1274, et al., Independent Producers Group Appellant v. Library of Congress, et al., Appellant ITG, Mr. Boyston, Appellant Settling Devotional Claimant, Mr. McLean, Settlement Appellees, Ms. McNeil, Intervenor Appellees Joint Support Claimant, Mr. Curtis, Intervenors Appellees, NPAA Represented Program Suppliers, Mr. O'Leary. Good morning. May it please the Court, Brian Boyston on behalf of the Appellant Independent Producers Group. We're here, of course, regarding a decision rendered by the Copyright Royalty Board, a part of the Librarian of Congress, with regard to the award of copyright distribution royalties for the years 2000 and 2003. The first issue I'm going to address comes along chronologically. I'm going to kind of move chronologically in terms of the underlying proceeding. And other than filing of initial claims and things like that, one of the first things that happens is discovery. The first issue we profiled in our briefing, the first issue I want to address has to do with discovery. Now, discovery sometimes can get to be a thicket, as we all know. Anyone who's been in litigation in the United States knows that sometimes discovery gets contentious, gets petty, et cetera, et cetera. And frankly, a lot of times, it's a tempest in a teapot. There's a lot of attorneys that every day make a big deal out of something that's not that big a deal in discovery. But this is fundamentally different. In the proceeding to distribute the 1997 copyright royalties, IPG filed a motion to compel the Motion Picture Association to produce all of the underlying data and electronic files regarding its methodology. The MPA did not. IPG moved to compel, and the predecessor to the Copyright Royalty Board, the CARP, granted IPG's motion, compelled the MPA to produce all of their documentation, all of their electronic documentation behind their methodology. In this proceeding, the same thing happened, but here, the CRB did not compel the MPA to produce everything. The MPA produced much of that material, but not all. And as a result, IPG was unable to replicate the MPA methodology. Now, the MPA has tried to say, well, if you look at Dr. Robbins' testimony, she acquit a case. She says, well, I could have done this. I could have done that. But at root, her testimony was, I was not able to replicate it. Now, curiously enough, the proceedings we're in right now before the CRB involving the satellite years 1999 to 2009 and cable 2004 to 2009, same thing happened. The MPA produced some of its material behind its methodology, not all. And it's interesting to note that in their methodology in that present proceeding, they used the same information that they used in this proceeding for the years 2000 and 2003. IPG filed a motion to compel. This time, the judges, these same judges whose decision we are reviewing now, granted IPG's motion. And when IPG got the full enchilada, IPG's experts were able to go recreate the MPA methodology. And lo and behold, what did they find? They found that using the MPA's methodology for 2000 to 2003, the numbers came up. Instead of being IPG entitled to a half a percent, three-quarters of a percent, IPG was entitled to as much as 7.5% to 4.69%, an enormous increase, an increase tenfold. IPG was then able to identify how it was that the MPA's expert, Dr. Gray, in this proceeding, said that despite that, IPG should only get half a percent or three-quarters of a percent, was because what Dr. Gray then did is he made an assumption that for every program where there was a conflicting claim between the MPAA and IPG, he automatically attributed all of those to the MPAA. And that crushed down IPG's numbers, despite the fact that there was no adjudication or establishment that all those programs were, in fact, belonged to the MPAA and not IPG. How did the lack of discovery cause that problem? I mean, you were certainly aware, as you've argued here, that they made that attribution to themselves. So the discovery problem here didn't stop you from making that argument. Well, no, but what we didn't know is that if you ran the MPA's methodology, you came up with 7.5% to 4% and change for IPG. What's the key thing, in your view, that they didn't turn over that would have made this difference? It was a file, which we've identified by name in the papers, called, I believe it's final under splash net or something similar to that. And we explained in the papers, and Dr. Roberts explains in her testimony why it was that that was. What is the incentive in the record that that was ever actually a saved file as opposed to a temporary document? Well, we know that it's been turned over in the current 2004-2009 proceeding. So clearly it existed. It exists now. Did the royalty judges know that? Did they have that information from the 2004-2009 proceeding before them? Well, no one knew it because nothing was ever produced. But for discovery rulings, we have to look at the decision based on the record that was before them. So what information did they have that that was actually the type of preserved formal saved file that would have been required to be disposed under their rules? I don't think anyone knew because, again, what happened was the IPG produced a certain amount of information. And IPG said, make an order telling them that they have to produce everything underlying their study, not just some things. Now, it could have been that if the judges had granted that order, that MPA would have come back and said, we have nothing more. But the judges didn't grant the order, and so the MPA was never put in the position of having to say under oath, yes, this is all of it, or this is all of it, plus there's more. In the present proceeding, that order was issued. And then the MPA had a choice. They could either tell the truth and produce all of the documents and all of the files, which it did, or say, no, nothing exists. So the point is that had the judges issued the order, the MPA to produce everything, then the MPA would have had to produce everything. What would that file have added to your knowledge or your expert's knowledge? It would have allowed us to replicate the MPA methodology. Without that, our expert was not able to replicate the MPA methodology. Well, how much of her inability to replicate it was due to time factors? I mean, if she'd been hired six months earlier, would she have had the time? There was plenty of time. We just never got that information. We had time to file a motion to appeal. Well, it wasn't that she didn't have sufficient time. It was that she didn't have the information. In the current proceedings – I didn't understand her testimony to say that. She was more equivocal about that. And I felt one of the things she wanted was this listing that they gave you in hard copy, not electronic copy. That was the barrier. That was part of it. But in addition to that, not everything underlying the methodology was produced. No, but not everything underlying the methodology not being produced is not the same thing as saying we had to have that stuff to be able to – I'm really trying to figure out what you had to have to be able to replicate the experiment. Yeah, and what we had to have was that last file, final underscore dash net. And I'm not sure if I have that exactly right, but I know the word file was in it. And when that was obtained in the present proceeding, our experts were able to replicate the methodology in very short order. I mean, I think it was within a week. So, I mean, you can imagine. It's like trying to bake a cake and not knowing some of the ingredients. You can sit there and it may take until the cows come home to try and experiment. Should I put in eggs? Should I put in a ham sandwich? How do I make this cake? Whereas if you have the ingredients and you know what they are, it's relatively quick. In 1997, did they give you that same file? In 1997, it was a different – I don't think it was the same methodology exactly. So, I don't think it was. But what I know is that the order in 1997 was that they had to produce everything. And as far as we know, they did. And IPG, you know, the important point about that is that the judges and their predecessors, and it's actually a flip-flop on this a bit, the Congregate Royalty Tribunal for 1997 made the order, you must produce this stuff. These judges in this proceeding said, no, you don't have to produce it all. And now those same judges in the current proceeding said, yes, you do have to produce it. I'll submit to you that I think – I mean, we don't know, but I think it's possible that the judges realized that they probably shouldn't have made that order in the prior proceeding, didn't, but did in the current proceeding. I think that speaks towards the issue, certainly. With regard to the issue of precedent, as we've explained in our papers, there is a rich precedent here from the copyright, the CARP, the CRT, before the CRB in dealing with these different issues. And the CARP and the CRT issued an opinion saying that viewership-based studies look at the wrong thing. Then one step further was when they looked at the 1997 proceeding and they said, in addition to that, viewership-based studies have a huge problem. There's too much zero-viewing. And the zero-viewing problem is a very, very significant problem, and I'll illustrate it like this. Didn't they just say you're going to need to explain it better? But viewership is still a key component in determining value here. And so what you're going to need to do is make sure your methodology and your explanations of what you've done address the problems that we have with the Nielsen studies. That one decision put it like that. Other decisions said viewership is looking at the complete wrong thing. And then that became compounded by the understanding that one of the problems with viewership-based is not just that it's focusing on the wrong thing. Viewership focuses on how many eyeballs actually see the program, whereas the decision here made by a cable system operator is not how many people are going to watch, how many people are going to subscribe to my service. And the CARP recognized that that was a fundamental difference, and that was why the CARP said looking at ratings is looking at the wrong thing. You have to look at what the cable system operator is buying, not how many people are actually watching the show and buying Tide detergent because they're watching a particular show. Compounded with that was then the decision in 97 when the zero-viewing issue was brought up, and the court said this zero-viewing problem is very significant and it has to be addressed. And if it's not satisfactorily addressed, we shouldn't be using viewership-based studies. Right, and so here they addressed it. They acknowledged the problem. They added a regression element to the methodology that was supposed to broaden some additional information to sort of patch over some of the problems. And some of them said were probably valid zeros. And so the question before us is not what they said in the past, but whether the judges reasonably concluded that there was a sufficient explanation here. Correct. Because all the deference of that judgment is due. That's correct. And if you look at the record on this, you'll find that the MPA that the explanation offered was not at all sufficient. Basically what they said is Dr. Gray said that he was going to aggregate up the numbers to fill in the blanks. And what that meant is as follows. If you look at a picture, you can see the picture just as a burger. But if you focus in on that picture so much that you get down to little pixels of color and all you're doing is looking at those little pixels of color, it doesn't make any sense. It's only when you move away that then the picture forms. The problem with zero viewing is this. It's as if you focus in like that so all you see are pixels. But there are very few of them. There just aren't that many, period. So then when you focus back, you don't get a picture of Chief Justice. You get a picture that's kind of like a cloud because there's too many missing gaps. What Dr. Gray said is I'm going to fill in those missing gaps, and the way I'm going to do it is I'm going to take all the data points I do have and make some averages on those and then assume that those are all standing in blank spaces, which statistically makes absolutely no sense at all. And I encourage you to go back and look at Dr. Gray's testimony because this is where it went down. In the hearing itself, after Dr. Robinson had explained this problem, the MPA had brought Dr. Gray back from the bullpen, so to speak, and had him try and give an explanation as to, well, what about zero viewing? And that's the best he could come up with. Well, they put me, judges rejected the methodology that your client proposed. You haven't challenged that decision. You haven't argued that they should have admitted your methodology. You've challenged aspects of theirs. Well, we do think that ours is high quality. I didn't get it because she presented a preview for us to overturn it. I didn't see you arguing that in your papers. So if your methodology is out, they're in a proceeding here, and they go, they've come forward with a methodology, they've given an explanation, maybe it's not perfect, but it's for our purposes, and they adjusted it some in your favor at the end. What more are they supposed to do? You didn't give them a discount on their methodology. Well, Your Honor, our contention is, no, that we do think ours is better. We think that ours is – Well, I'm just asking for reversal here of that decision here. So we're stuck with the determination, you're stuck with the determination for purposes of appeal that your methodology is out. So what they did was they took the methodology before them, looked at the – made sure it had the explanations, more information than before, made their own adjustments. What basis do we have to reverse that? The basis upon which I've just stated, which is that it's not a valid methodology, and our position has been – What happens if there – so the answer is there's no methodology in this case. I'm trying to get to that point. No, our position has always been it should be our methodology that's been selected, because the problems they have – yes, okay, maybe they have some problems with our methodology, but what we were trying to say is, based upon the precedent and the testimony regarding zero viewing, their methodology has more problems. Their methodology is one that the predecessor entities have said, you should never base a distribution methodology on this. That would leave just our methodology, which is what we're advocating, or what we're asking for. I want to turn quickly to the issue of Canadian rights. This has been misunderstood, I think, a little bit in the government's papers. The issue with the Canadian broadcast is this. The NTAA's expert said anywhere between 75 to – Can you clarify one thing when you say Canadian broadcast? Do you mean U.S. copyright shows broadcast into Canada or Canadian? No, and I'm glad you asked because the problem is exactly where you're going. The Copyright Act provides – or not the Copyright Act, but the way that the Phase I categories are set up, there's a Canadian broadcasters category. If you are a Canadian company and one of your programs is broadcast in the United States, you obtain royalties only through the Canadian broadcasters group. However, if you're an American broadcaster but material of yours is rebroadcast from Canada back into the United States, which happens, oddly, but it does, then you, the American owner of that Canadian-originated broadcast, have a right in the Program Explorers category. And the judges acknowledged that. They agreed with that. What happened was that Dr. Gray didn't understand that distinction, and Dr. Gray said, I conclude that in certain years, IPG's programming is 75, 30% Canadian, and it's not compensable. Well, he was wrong. It was compensable because IPG's programming was coming from – it was coming from Canada, but it was only American-owned programming. And then the judges even acknowledged all this and said, yeah, yeah, okay, fine, but we're not going to give you any more money because we think it's a small percentage because the overall percentage of programming that comes like that from Canada is only about 3%. Here's the problem. Take a given year where the MPA methodology, IPG gets half a percentage point of the overall pie. Well, if it's half a percentage point of the overall pie and they were throwing out Canadian broadcasting, which was anywhere from 30% to 75% of our total, then logically we should have seen a doubling or perhaps even a tripling of that percentage because they're saying, okay, we think you get 50%. Oh, and also 50% of it was Canadian, so you didn't get that. Well, the judges said that's incorrect, but then they didn't say because of that we're going to bump you up. They said it's insignificant, and that's just simply not mathematically correct. The last thing is – and I know I've gone over my time, so I'll wrap up soon – but with regard to the preliminary hearing issues, there are a host of things that went on in that preliminary hearing that just made absolutely no sense at all. The biggest one, of course, was when they threw out claims that weren't even contested, and we brought a motion for reconsideration saying, look, you've made an error. You've got to at least give us these programs, and they did it. And no one in any brief has given an explanation for that because there simply isn't one. It was a mistake. It's a complicated procedure, sure, and things like that happen, but that's why we have a Court of Appeal because if nothing else, the stuff that was wiped out in the preliminary hearing that wasn't even contested, we should get credit for that. Thank you. I've asked for two minutes on rebuttal. I don't know if I still have that or not, but thank you. Thank you, counsel. May it please the Court, I'm Matthew McLean, representing the Settling Devotional Claimants. I'd like to reserve two minutes of my time for rebuttal. In the devotional category of these proceedings, the Copyright Royalty Board excluded evidence that should have been admitted, ignored evidence that was admitted without objection, and by its own admission decided the matter based on no substantial evidence. Now, the Board correctly and properly rejected IPG's distribution methodology, which it found to be unusable and to lead to absurd results, and that issue is not on appeal. But it refused to consider the SBC's proposed methodology, creating a quandary of its own making, in which it had no methodology before it in the devotional category. So without any methodology, without considering any methodology, and faced with two competing claims, the SBC's claim and IPG's claim, it arbitrarily chose IPG's unsupported allegations for the years 2000 and 2002. What are the judges supposed to do? You take the position that IPG was properly disregarded, and they haven't appealed that here. Your methodology is procedurally barred by the judges. It's a very difficult thing for us to reconsider our review. What are they supposed to do when neither party has approved their case, essentially? So it's two things. First of all, Your Honor, our methodology was not procedurally barred. It was something that just grew in. What are the judges supposed to do? I mean, the judges thought it was out. So for the purposes of this question, at least, that it's out, what are they supposed to do when neither party has proven its case? Well, Your Honor, there are several things they could have done. They could have requested the parties to present further evidence. They're running out of time, right? In the statute, do they have time for that? Your Honor, first of all, obviously, we don't control the schedule. We were following the schedule that the Board presented to us. I would also point out in the current proceedings that are ongoing right now, the Board has actually requested the parties to consent to an extension of the statutory time period, and all the parties have consented to that. So I'm not sure that that would be an absolute bar. Did you ask the judges to have a consensual bypass of the time limit so that you all could have a second chance at putting on methodologies? Your Honor, it never came up one way or the other. So, no. But the time limit, though, Your Honor, is a time limit that restricts – that's a time limit on the Board. I mean, they've got to do their job. Right. So they've got to do their job. Both parties have come in, neither of which has managed to prove their case. I'm just speaking for their determination at this point. I assume that's for the question. What are they – what's left for them to do? Are they supposed to come up with their own methodology, or is this like an adversarial trial system where somebody doesn't prove their case, they go home empty-handed? Your Honor, neither the SEC nor IPG have the burden of proving any particular methodology. The burden was on the Board to articulate a basis in – a substantial basis in evidence, a non-arbitrary substantial basis in evidence for its determination. It could have requested witnesses. By its own rules, although the Board disagrees with this, but according to its own rules, it could have subpoenaed witnesses. Could they come up with a methodology on their own, or do they really have to get it from the parties? Are they trying to figure out if it's like an expert agency, they can just devise something on their own, or are they reactive to what the parties present as options? Your Honor, they're not limited to what the parties – to the methodology the parties put into evidence. And that's – and, in fact, the Board has routinely argued and has ruled we're not bound to use any particular methodology, and they're right. They're not bound to use any particular methodology, except that they are bound to use a methodology that is not arbitrary and that is based on substantial evidence. Neither IPG nor SEC has the burden. The Board is not a – the Board is composed of judges by statute, but those judges comprise not a lower court but a Board, and they're a party in this appeal. Their lawyers are sitting right here. The burden is on the Board to articulate a non-arbitrary basis in substantial evidence, and the Board failed to meet its burden. As part of the problem here, the difficulty here, that you came into the case, your clients came into the case asserting 100 percent of the funds, the royalties, even though you knew another party was there asserting funds. You didn't know the scope or extent of the claim, my understanding, but you knew someone – they were there and they were going to be collecting for something. So is a part of the problem here essentially a strategic choice that you made to go in, fundraising, asking for 100 percent and ignoring the fact that someone else was going to be asking for funds and for us to go in and say, we think we get 100 percent, but if you need a methodology to make it up, here's what you should do. Your Honor, we went in. It's not just a matter of us not knowing what IPG's claims were, although it's true that we did. We went in with a 100 percent allocation because we were moving to dismiss all of IPG's claims. Now, ultimately, we lost that motion, and the Board substantially ruled against us. At the same time, they substantially ruled against us on that position. They issued a decision. They issued an order saying the parties are prohibited from filing amendments. Well, this happens in litigation all the time. You have to go in with alternative positions. Our position is 100 percent, but we acknowledge the fact that someone else has a claim here. We think this can all be disclosed, but for some reason they can't. Here's a methodology. What prevented you from doing that? Your Honor, well, I don't think the rules required us to do that. I didn't say what required you to do that. I said what prevented you from doing that. I would say what prevented us was that we were confident in our position that IPG was Then that was a strategic judgment you all made that turned out to be mistaken. A strategic judgment in reliance upon the rules and the Board's past practice, which was to allow rebuttal methodologies. It's a perfectly valid rebuttal to a methodology to present a better methodology that leads to different results. And that's what the Board has allowed and the Board's predecessors have allowed in the past. This is the first case that we're aware of in which the Board has ever presented a party, from presenting a methodology on rebuttal to rebut an opposing party's methodology. If we agree with you on this, what should happen? Your Honor, the case should be reversed and remanded and sent back to the Board for further determinations. And what directions, if any, would we give under your theory? Your Honor, all we're asking for is for a remand with an order to decide the case based upon substantial evidence. And the Board could have a wide range of discretion as to how they do that. They could consider the evidence that's already in the record. Keep going. They could consider the evidence that's already in the record, which includes Dr. William Brown's rebuttal testimony that sets forth our entire methodology. They could ask and request the parties to present further evidence, which the Board and its predecessors. That's what you really prefer, isn't it? Actually, Your Honor, what we believe the Board should have done was to decide the case on the evidence before it, which includes Dr. William Brown's rebuttal testimony. That would be our proposal to the Board. But I acknowledge they have discretion. If they're not remanded, you're essentially getting – let's assume that from the perspective of the judges, there was essentially a procedural default on your end. And then what you're getting on remand is getting right around that. You're getting either having them crediting what you put in at rebuttal, which they didn't think was fair. They thought it was trial by ambush. They were there. I wasn't. That's how they characterized it. Or you're getting a second chance to do what you could have quite easily done the first time around. Is that fair to the judges? Well, first of all, Your Honor, the judges decided this case based upon a theory and an approach that no party had suggested. If there was a trial by ambush here, it was by the Board, because nobody had an opportunity to rebut its intentions in this matter, which were not based on evidence. But aside from that, they don't have to do what I'm saying would be the best option, which would be decided based on the record before them, because there was no objection to the admission of Dr. Brown's testimony. But they could request further evidence. They could, we believe, although the Board disagrees, subpoena their own witnesses. Subpoena FBG's witnesses or his witnesses? No, subpoena – the Board could subpoena witnesses. The Board – I thought you said you could subpoena the Board's witnesses. I'm sorry. The Board's regulations provide that the Board can subpoena witnesses. The Board itself has ruled that it doesn't have that authority, notwithstanding its regulations. We believe it does. The parties don't have that power, but the Board does. The Board could subpoena witnesses, we believe. The Board could hire its own expert witnesses. There's authority for incurring costs. If they do that, then do you get to subpoena their witnesses? How does that work so that you wouldn't have, as you said, ambushed by the Board? And procedurally, I don't think that ever happened there. How would that work? Your Honor, we would certainly be required to have notice and an opportunity to respond to whatever evidence the Board chooses to rely on. And this is consistent with this Court's decision in the intercollegiate case, which is cited in our brief, in which this Court ruled that the parties in that case, in reversing the Board's decision, could hardly challenge a theory first presented in the judge's determination and not advanced by any participant. That's exactly what the Board did in this case, in our case, was to present a resolution, I suppose you would say, that was not advanced by any participant. So clearly, we would have to have the opportunity to respond to whatever evidence the Board chose to rely on. All I'm saying is the Board has broad discretion, but it must decide based on potential arguments. I see that I'm out of time. Thank you. Thank you. Good morning. Sunday McNeil for the government. Unless the panel has a different preference, I'd like to start with the distribution of the religious programming royalties. A party has to enter its methodology in its written direct statement. A party who waits for rebuttal to offer this evidence, prejudices the opposing party, denies the judge's adversarial presentation of any critiques or flaws of that methodology, and impairs the streamlined process that Congress established for the efficient and orderly distribution of cable royalties. So what happens is, because of one methodology getting thrown out, another one, in the judge's view, coming in too late, being procedurally barred, they go through this whole procedure and they have no methodology in front of them. Your view is they get to just divide their own methodology as they did here, and nobody has any notice of it or ability to address it? That's how this should go? Your Honor, the judge's obligation under 803A is to make a decision based on the record. And here, when the judges rejected one party's methodology on the merits and another party's methodology as procedurally barred, they looked to the record before them to see if there was another rationale. So the record's incomplete, or the record is such that they're unable to make a reasoned determination, because the final determination here does seem, I'm going to load the dice here, but it does seem arbitrary how they came up with the final determination. And if that's the final determination, shouldn't they go back and say, well, we need to supplement the record, or we need to do something to provide us a better basis for making a reasoned determination? Two points. First of all, Your Honor, I have to disagree with your characterization that the determination is arbitrary. What the judges did here was they looked at the parties' own proposals, and they said for two of the four years in question, the parties either actually agree about what an appropriate distribution might be, or they've come pretty close to agreeing. To back you up, because I'm aware of that position, but to follow up or continue on Judge Kavanaugh's question, let's assume a hypothetical case. And so both methodologies presented by the parties have been thrown out, and the record is incomplete, and the cost is about to run on the time limit. What are the judges supposed to do then? If what you mean by the record is incomplete is that the parties haven't even told the judges what they would accept as far as a distribution. Not what party has given them a rational basis for methodology for divvying up the funds. It's not sufficient in the record. What would happen? Your Honor, the parties' own proposals in general and specifically here. I ask a hypothetical question where the record is incomplete and does not allow. . . Assume the numbers are far apart. What is your view? What are they supposed to do? Well, in that case, I think it's a hard question, and the judges have never been presented with it. But what they did here was. . . I know what they did here. I'm really trying to figure out what they're supposed to do. If the record doesn't give them a methodology, are they just supposed to. . . When they come up with something completely on their own, nobody gets any chance to address it. Like they did here. They came up with a sort of Solomonic, I guess, approach, splitting the baby. Nobody had any idea that was coming. Nobody got to address it. Your Honor, I don't mean to be a broken record, but it cannot be the case that nobody had any idea that this was coming when the parties' own proposals overlapped for the year 2000. And if the proposals hadn't overlapped, what would happen then? If the proposals hadn't overlapped, I think the judges would have been in a very difficult position. Congress didn't set this up as an inquisitorial system, and it didn't. . . I'm really trying to get what they should do. What do you think they should do? Should they call for more evidence? Should they say, we give up on you guys. You haven't given us anything rational. Here's our proposed approach. Let them have reactions to it. So they've got this clock ticking. Well, I suppose that one thing they could have done, and this is an issue that the Court considered in the recent music choice case, is looked to the distribution in the prior year. It's a common sense proposition that the world simply doesn't change overnight. And so if the parties had given them absolutely nothing to go on, they could have said, well, how did this all come out last time? Were the same parties in front of us? Do we have any reason to believe that the world looks completely different? In the music choice case, and I refer the Court especially to 774X3 at 1009, the judges were confronted with evidence that they felt was seriously flawed. And so as further guidance, they looked to the record in a prior proceeding. Here, though, we do not have that problem. The copyright royalty judges recognized that the parties actually agreed on one of the four years in question, and they very nearly agreed on the 2002 year. How binding is the statutory time limit, in your view, on the judges? Can they agree with the parties to go past it, or is it really a hard and fast limit on them? That's going to be part of the problem here, too, concerned about bumping up against the time limit. Well, nobody thought in this – nobody proposed in this case to the judges that they extend the statutory time limit. And I think it's hard to fault the judges for trying to do the job that Congress set for them in the way that Congress told them to do it and in the time that Congress told them to finish it. Do the judges have authority on their own or upon proposal by the parties to go past that time limit? Your Honor, that question is not presented in this case. Perhaps it will be in a future Cable Distribution Appeal, but I'm simply not able to address that at this stage. You don't have a position on whether they can do that? We have no position, Your Honor. Here, as the judges recognized, the fact that the settling devotional claimants waited nine months after other parties – actually, after all other parties amended their written direct statements to introduce what was functionally the guts of its methodology. Can I interrupt? You said for one of the years, I guess for 2002, it was nearly – it was close. Yes. But it wasn't – they didn't agree, actually. You said nearly agree. That's correct. Right. So, I mean, that strikes me. There's a difference there, right? There is a difference, Your Honor. But, again, the settling devotional claimants calculated risk in this proceeding, presented the judges with a problem that they had to solve. Their job was to find a rational way to distribute the pool of money in front of them between the two people who said that they wanted it. And so what they did was they looked at the numbers, and they took the figure that IPG proposed, and IPG, I might – And then what about 2001 and 2003? What do you say for that? For 2001 and 2003, the parties' proposals didn't coincide, and there was also, as we discussed, no evidence in the record – other evidence in the record that the judges could turn to. So they took the 2001 – Isn't that the classic situation, then, where the agency should say, we need more, rather than just throwing a dart at the dartboard. But, of course, they didn't throw a dart, Your Honor. They looked at the 2000 and 2002 years, and they said, not only do the parties substantially agree, but these two numbers are close. And the 2001 and 2003 – Substantially agree is another way of saying they didn't agree for 2002. They didn't agree. It is, Your Honor. But if you conceive – you could conceive of what the judges did as taking the parties' proposals as a zone of reasonableness and trying to fix a point within that zone. As the judges pointed out in their referring order – I think it's a zone. It's outside. Go ahead. I think we had the same question. It's outside of the zone on the one year. Well, isn't it outside on all years, because in all the preceding parts of their decision, they said IPG's methodology, which produced that number that we're using, was entirely invalid. So how do we even know the IPG numbers they were relying on, using a valid number, to be employed for purposes of the approach that they took? Well, the inquiry here is relative market value. And it's reasonable for the judges to think that what a party thinks its own content is worth might have some bearing on what relative market value might be. That's true in a case where they've said many times that viewership is at least a key component of that relative market value, and IPG's numbers came to them without factoring in viewership at all, and using the methodology that they said absolutely could not be credited. So how could they even give that number that they had any role at all in their decision-making? How can you say it's bad, bad, bad, bad, bad, but we're going to use it? The analysis can be bad, bad, bad, but the judges can rely on the record in making their determination, and a party's own proposal, its own statement about what it would accept, is a part of the record and a proper basis for the judge's determination. In fact, it's what it thought it was entitled to, based on doing an analysis that they said couldn't be credited. Well, I think it's difficult to fault the judges for looking at the party's own assessment of what they thought the market value of their content was, for whatever reason. They thought that that number was improper. Even if they knew that they had come to that market value number using a definition of market value that the judges had said was entirely invalid and didn't even factor in the most important consideration that they were using. Your Honor, the judge's obligation is to make a decision on the record and to find a rational way to split up a pot of money between two parties. Do we wish that the evidence in this case was better? Absolutely. But we had a job to do, we had a time to do it in, and we resolved the problem that the parties presented us with in a rational way, based on the agreement between the parties for 2000, the close proximity of the parties' numbers in 2002, and relying on the common sense proposition that at the stroke of midnight on December 31st of 2000, everything we already know about what might be market value doesn't change. Can you talk about the decision about whom an agent represents in proceedings before the judges? Is there an established standard as to when someone comes forward, they make a claim and someone contests it? What the standard is for determining the validity of a representation claim, who bears the burden of proof, and how are we supposed to review a decision? The parties, the proponent, the person who claims to be the designated agent of a claimant, bears the burden to provide evidence that facially shows an agreement to act as the principle for another. That's the standard that the judges applied here. And the judges in this case appropriately concluded that things like unexecuted agreements, partial email strings, simply don't suffice to answer the question whether IPG or anyone else is properly in front of them. Whether if the judges gave them money, they would have an obligation to pass it on to somebody else, specifically the copyright owners. Is there a standardized rule that they use for determining what you have to show? Because they seem to acknowledge if you have oral agreements, you may not view written evidence at all. And I'm just trying to figure out, because it came up in both of us, the cases here, if there is sort of a regularized standard that's being applied. It didn't seem to me that there was. There is. And, Your Honor, I apologize. I don't have the GA citation at my fingertips. But the standard is evidence that is facially sufficient to show an unambiguous authorization by the copyright owner for another person or entity to act as a judge. You didn't have that even from MPAA. You had something from a third party who said they were an agent of the copyright owner. But you didn't have something from the actual copyright owners in MPAA if the judges credited it. The judges had no reason to doubt, and IPG didn't dispute, that the middlemen with whom MPAA had signed agreements actually had authority to represent the underlying copyright owners. Again, the question that the judges are trying to... IPG was very much contesting, I forget, 600 or something of the representation. And so if you don't need evidence from the actual copyright owner, I'm just trying to understand what a fair, easily applied standard is that could be applied here by the judges, to know that they're doing it that way. They are making it up as we go along from case to case. In the absence of any reason to believe, and IPG offered none, that the middlemen with whom MPAA had a contract actually represented the copyright owners, it was perfectly within the judge's rights to accept that. And I might add, I believe that the middlemen in this case also had certifications from each one of the individual copyright owners. But that's not put into the record, right? Your Honor, I hope that my colleague from MPAA might be able to answer that question better than I can. But the point is that the judges didn't hold MPAA and IPG to a different standard. They asked in each case, essentially, if we give you a part of this copyright royalty pie, do you have any obligation to pass it along to somebody else? And if not, then what are you doing here? And so your view is that someone comes... because the regulations or practice requires someone to come in and just make a representation as to their validity as an agent, and if someone contests it, the burden of proof is on the claimant and not on the person contesting representation. It sounds like IPG didn't meet a burden of proof. There's ways they articulated it, as opposed to other people showing that they didn't. I'm just trying to make sure I understand the rules again. The rules are that the burden is on the claimant to demonstrate that it's the designated agent of the owner or owners that it purports to represent, and that if somebody wants to challenge it, they have to provide a good reason to doubt that the evidence that the claimant has put forward is not sufficient to provide a facially valid showing of authority to represent the underlying copyright owner or owners. IPG here offered no reason to doubt that the middlemen actually had authority to represent the underlying copyright owners, and the judges appropriately concluded that even if IPG's challenge had been timely, which is important to emphasize, that it was not that IPG's claim lacked merit. In the semi-devotional case where they barred the parties from doing amended written direct statements after their ruling, which said who would have what claims, sort of some validity of claims out, have they done that in the past to not allow people to amend statements in response to their determination as though, right, here's the claims that each party has here? Your Honor, let me answer your question by walking through, and I think this would be helpful, the sequence of events here. All of the parties filed their written direct statements in May of 2013. IPG and MPAA, that prompted a discovery period. At the end of that discovery period, pursuant to the judges' regulations, a party has 15 days to file an amended written direct statement, which both MPAA and IPG did here. That was in August of 2013, and it was not until later that the judges said, look, we've done all we can do on this. You've had your opportunity to test the veracity of other parties' written direct statements, those who have wanted to have amended, and we're simply not going to accept any more submissions on this at this stage. I'm not aware of any instance where the judges have or haven't done this in the past, but it was perfectly appropriate under the circumstances, and the SEC cannot seriously argue that they were either surprised or that the judge's decision was unfair. I'm happy to take questions on any other part of the case. We ask that the court dismiss IPG's appeal regarding the FIFA matter. I have a question on the IPG case. Did the judges throw out claims or even contest it? The party's burden, as we've just discussed, the claimant's burden is to show sufficient evidence to find a facially valid designation of authority. The judges have an independent ability, and they appropriately exercised it here, to make sure that no one is entering claims that they lack authority to assert. And so when IPG didn't make, or for those instances where IPG didn't make an adequate facial showing, the judges appropriately rejected the claims. Do you have a view on the jurisdictional question of how interlocutory orders are meant to be reviewed or not? Your Honor, my view on the jurisdictional question is that your decision last year in the 2014 IPG case, the rationale settles the question here. And it's worth noting, IPG doesn't argue otherwise. The order regarding IPG's authority to represent FIFA is not a final determination under 803C. This court recognized in your opinion, Judge Millett, that although the judges issue different kinds of orders, it is only a final determination under 803C that is subject to direct review in this court. The judge's order regarding IPG's representation of FIFA is not such an order. IPG agrees, and we ask that the court dismiss that part of the case. The NPAA strongly disagrees with you on that. I think it's the joint sports claimants, Your Honor. Yes, the joint sports claimants. But they're brief. They say that would wreak havoc, I think is the term that they use. How do you respond to that argument? Your Honor, I disagree, first of all, of course, that it would wreak havoc. But not having direct review in this court would not leave a party without a remedy. A party who was dissatisfied with an order not subject to direct review in this court could do what IPG itself has done here. They could go to state court or to federal court in diversity jurisdiction, and if they think they were denied something by the judge's order, and as a result they weren't paid a fee or somebody else. Does that make any sense? I mean, that just sounds like a very roundabout way of doing something that would be very simple here. The judge's jurisdiction, Your Honor, as this court has recognized almost 30 years ago, does not extend to adjudicating contractual disputes. And in the situation that's presented here, what IPG did, what it appropriately did, was sue FIFA in state court, the case was then removed to federal court, and assert that FIFA had breached a contractual obligation to it, and as a result it was denied a fee. That's not the sort of question that arises under the Copyright Act, as this court has recognized and as Judge Millett's decision last year recognized. And so far from wreaking havoc, it's perfectly appropriate for the judges to conclude that those decisions, it's perfectly appropriate for this court to conclude that those decisions belong in a different forum. Well, let's see. Last year's decision involved a no controversy, a challenge to a no controversy determination and distribution that happened years before. I sense a way that could be reopened for a challenge in this court. What you're talking about here is a number of predicate decisions, all of which were steps leading down the path to the final determination. And in ordinary district court litigation, all interlocutory steps are wrapped up in the final determination. And here, all of those intermediate steps were aspects and parts of the final determination in this case. So isn't this very different from last year's case? It's not, and let me explain why. It's critical to understand here that what the final determination addressed was the distribution in the syndicated and religious programming categories. The government doesn't contest this court's jurisdiction to address the judge's orders on the validity of claims in those two categories that matured into the final determination. But IPG's claim about its representation of FIFA in the sports programming category, when that claim was addressed, that resolved the last remaining controversy in the sports programming or the last remaining issue in the sports programming category. All of the parties had settled. An ongoing disputed proceeding, which wasn't the situation in the prior case of IPG. There, it had been a settlement. There was no decision by the judges at all other than to execute a settlement. Here, you have an ongoing dispute. This is one of the claims. IPG obviously disagreed strongly with the determination that didn't represent FIFA, but the judges just said, we're going to go ahead and say we're done here and distribute the money midstream, essentially mooting their ability to get review of our decision. That seems to be very, very different than the implementation of the settlement, an uncontested settlement by parties. This was very contested. Your Honor, I disagree, and let me explain why. Recall that in the last IPG case, what was involved was a consolidated proceeding involving royalties for two years, the 1998 and the 1999 royalties. The 1999 royalties went on to a final determination under 803C. I understand that that was published in the Federal Register in the last few weeks. But what the judges said in that determination was, we're resolving here in a determination through a contested proceeding, the distribution for the 1999 royalties, but another part of this docket, the 1998 royalties, has already been resolved. And this Court said, Judge Millett, your opinion for this Court said in that case, that the order that resolved the 1998 distribution was not a final determination under 803C, and thus it was not subject to direct review in this Court. We're in the same position here, and the same result obtained. Thank you. Good morning. May it please the Court, Charles Curtis on behalf of the Joint Sports Claimants. Judge Kavanaugh, you're right. We strongly disagree with the jurisdictional argument that has been made. And just to identify the parameters of that argument a bit more, because there's a difference between the government and IPG. The government argues that the March 21st claim validity order is unreviewable in this Court, to the extent that it involves the sports claims. Now, the government concedes that it is reviewable, that that order is reviewable, to the extent that it involves the program suppliers and the devotional claims. The only difference being that, using your word, Judge Millett, on an interlocutory basis, the royalty judges decided everything with all of the disputed issues with respect to the sports claims. It just strikes me as irrational to say that reviewability in this Court turns on whether the judges were able to make, in essence, a summary judgment decision and resolve certain claims, or whether they had to leave claims open until the absolute final determination. That just makes no sense. And it certainly violates this Court's longstanding emphasis that judicial review of agency proceedings should be concentrated in one forum and not fragmented among many. So that's the March 21st order. IPG came in and responded that they agreed with the sports argument, but that, indeed, everything in the March 21st order should be unreviewable in this Court. IPG also went on to say that in the May 17th program categories order, which dealt, among other things, with the Olympic trials programming, said that that also is unreviewable in this Court. Both the government and IPG obviously rely on this Court's decision last year in IPG-1. It strikes me that the decisions, the two orders at issue here, are everything that the order in last year's decision was not. Last year's decision involved a settlement, a 10-year-old settlement to which IPG had been a party. IPG never settled, reached any such settlement here. Last year's decisions did not involve contested 803B proceedings. This does. These orders were made in the course of the 803B proceedings. They were based on a written record, findings of fact. This was a contested determination. I also might add that these two orders, although they were not published in full in the Federal Register, were discussed repeatedly in the final determination that was published in the Federal Register. And I refer the Court to Joint Appendix 5995, Notes 2 and 3, 5996, Note 5, and 5998. Now, I'm not suggesting that whether or not an interlocutory order is cited and discussed in the final determination is the touchstone of reviewability. Of course not. But in this case, those orders were discussed in the final determination. Moreover, we're talking about federal questions here. Ms. McNeil said that the FIFA issue before the Court really is nothing more than a contractual kind of issue, like the issue involved in the California litigation. That's not true. The FIFA issue here is a federal question. The federal question is whether IPG was the designated agent of FIFA within the meaning of Section 111. And the judges held that as a matter of distribution that IPG was not, because FIFA had come before the Court, come before the judges, and said IPG is not our representative. Now, that's a federal question, not a collateral contractual issue. Judge Millett? I'm sorry. I'm sorry. Do you think the judges have a discernible standard for representation decisions, that they consistently apply across cases? Wouldn't you have to show it to show that you're the agent for somebody? I generally agree with Ms. McNeil. But whatever... Do you find that something that the best articulation that they have outside this case is what that standard is? I didn't see any regulation on it, and I didn't see other decisions that seemed to clear this sort of fogginess of... Right. I didn't see anything like this MPA has in New York. Your dog doesn't need... Yeah. Your dog doesn't fight so much, but you mentioned the issue. What they have, what MPA has, is supposed to be enough. I'm just trying to make sure there's a consistent, even-handed standard. I think there are a number of factors that need to be considered. One of them is the track record of royalty distribution proceedings. In many cases, agents have appeared before the royalty judges for years and years and years without any dispute, any issue about the bona fides of their representation of the principal. That might be one case where the rules might be relaxed a bit, as it were. But as you noted, Judge, in this case, at least as far as my clients go, there is a bright-line rule, and that is when the alleged principal, the alleged copyright owner, says, this entity may not represent me, that's pretty clear. That didn't cover everything they kicked out here. Pardon me? That didn't cover everything that they kicked out here. I understand. Right. I understand. I also wanted to mention, and Judge Millett, you got into this a bit. In last year's decision, the Register of Copyrights, in making the final distribution, had made a determination that all, I'm quoting, all controversies had been settled and no other controversies remained. That's not what the royalty judges did here. In fact, if you look at the actual distribution order, and that's at Joint Appendix 6958, the royalty judges acknowledged that IPG continued to dispute their determination, and that IPG, in fact, and this is discussed in the distribution order, IPG said, we disagree and we're going to appeal this. And since we're going to appeal, hold up on the distribution. And the royalty judges responded that, yes, we understand you're going to appeal, but we're going to distribute anyway, subject to, and this is in footnote two of that distribution order, subject to the understanding that the joint sports claimants are going to have to repay the money, return the money, if, in fact, the determination is overturned on appeal. So it seems to me this is a very different kind of distribution, certainly not the kind of final unqualified distribution that was at issue last year. And finally, I would just note, going back to your rationality of this, again, it just makes no sense to me to suggest that a given order, like the March 21st order, parts of it may be appealed to this court, parts of it might go to the district court under an APA claim, some parts of it might be unreviewable, depending on whether or not the interlocutory decision resolved all the issues or left issues open for the final determination. And finally, I would just say, I think it's pretty clear that this court does have jurisdiction over these orders under 803D. I think it's quite clear. But if the judges think there's any ambiguity here, I would just refer to the media access policy case, cited on page 19 of our brief, where this court said, when it is unclear whether review jurisdiction is in the district court or in the court of appeals, the ambiguity is resolved in favor of the latter. Review is here. If the judges don't have any other questions, thank you. Thank you. May it please the court, my name is Gregory O'Lantern. I represent MPA, I represented Program Supply. Thank you. Your Honors, I intend to cover one principle point, and to the extent Your Honors have any questions for some of the points that have been covered earlier, I'm happy to answer those questions. Contrary to IPG's argument, the record is clear that MPA complied with the applicable discovery standards with respect to producing all of the documents that were required. Before I get into that main point, I should note that Dr. Gray's testimony regarding the allocated shares between IPG and MPA was actually presented in an amended direct testimony. IPG did not move to compel any discovery on that amended direct testimony. It is our position that by failing to do so, they have to waive the right to challenge MPA's production with respect to... Had the motion to compel already been denied at that point? That was a different type of motion to compel. There was actually the initial... Have you already asked for this stuff and been told no, and are you saying that they should ask again after the amended statement? The initial motion to compel addressed the initial direct testimony. There was no motion to compel with regard to the amended written direct testimony. What would have changed? The difference between the two direct... In the initial testimony, MPA didn't have any discovery, didn't have what IPG was claiming, and so they couldn't really articulate their share between the parties. That was what led to the amended written direct testimony, and IPG did not move for any discovery on that, on the amended written direct testimony, which actually articulated the allocation of shares between the parties. Did you have an obligation? Is this like a district court, an ongoing discovery, an obligation to turn over new information as it comes forward with relevance? No, we did... And so since the testimony changed, your statement changed, did you have a duty to come forward with more? No, we did not, because at that point, we believed that we had actually fully complied with the discovery requirement. And let me ask you this... So would a motion by then after your amended direct statement have been opposed by you and properly denied? I'm sorry, I didn't know that. You seem to be saying that they should have filed another motion after your amended direct statement, but then now it sounds like you're saying, of course, if they had, we would have opposed it and it would have properly been denied. That's correct. If they had filed it, we would have, because we believed, even after the amended direct testimony, the document production that we did after that, we complied with the rule. That's just under their argument that in prior proceedings, y'all were stingy and they went to the judges and you were ordered and you turned over everything you should, including the materials they want here. And in the subsequent proceedings, 2004 to 2009, they had this same problem. And for some reason, it was just a different result here, which had different consequences for their ability to replicate your program. Your methodology, I'm sorry. Well, that issue that was actually raised for the very first time in IPJ's reply brief, that they have some new information that's not part of this record from another proceeding where they believe that they've gotten additional information. Our response... Isn't that where you're unusually stingy here? I'm sorry? Were you more stingy than you were allowed to be in other proceedings here? Were you more stingy here than you've been allowed to be in other proceedings? Well, again, I don't... I don't know if we're more stingy here than we were. I can't tell... I can't represent to the court there. We actually complied with the discovery requirement. And the judges reviewed our position on that, and they ruled on it. Now, with respect to this new information that IPJ's contending that they found in another proceeding, first of all, this is clearly a representation by counsel in a brief. Second, it's a representation by counsel about an ongoing proceeding. And so for those reasons alone, this is impermissible, impermissible testimony. And to the extent that they claim that their share would have increased or whatever, we don't know. We have no way of testing that assertion to challenging it or defending it. What about this file they identified that they say was the keys to the kingdom, that they needed to have this... I forget, none of these acts I can read on the Web site. Well, here's... If you read Section 351F of the judges' regulation, it actually talks mostly about input data. And it talks about the input data that the expert witness is required to provide in order for another party, an opposing party, to actually test the assertions of their witness. You mean techniques of estimation and testing? Yes. Results of the study's actual estimates and tests. And so wouldn't that have captured this initial stage? Before you gave the final allocation and spread everything out, did this file actually break down, explain, identify how you were going to divvy these things up between... Correct. And Dr. Grigg did provide that information. And specifically, Dr. Grigg provided information about all of the data sets that he used. He provided information, step-by-step instructions on how to merge the data. He provided log files. You mentioned the rule as to what you had to disclose, and it does cover a lot more than just input data. So what I'm asking you is, in the rule at 351.10E on expert witnesses, did the file that they were asking for fall within this rule? If you're only talking about the integrated, I think it's called the final integrated study, if the file that IPG actually came up with, there is no such thing, and Dr. Grigg testified to that. And it really has to do with the way in which he conducted his study. And he provided all of the inputs that would have allowed IPG's experts to replicate his study. IPG's expert, Dr. Robinson, actually admitted in her testimony that she received all of the files. She also said she successfully merged two of the files but chose not to go any step further. So she had the files to replicate the study. Now, the final integrated study that IPG refers to is not a file that MPAA came up with. It is IPG's belief that such a file exists. But Dr. Grigg was very clear about the process he undertook, and he has somewhat of an automated process that he used to generate the allocation of shares. It was IPG's belief, not MPAA's, that a file should have existed that captured whatever this final integrated study would have been. But Dr. Grigg said such a file did not exist. So it's almost impossible to define not producing a file that you never had in the first place. And did the judges deny the motion to compel on the grounds that the document didn't exist, or that it might have existed but it wouldn't have fallen within the ordinary discovery application? I believe they ruled that, well, with regard to... Just that file. You know, I don't recall specifically what the denial was. You didn't give a lot of reasons. Well, with regard to this, but I don't think it had to... I think they did, and we did not have to produce it, am I right? They didn't say why. Is that sufficient? Well, they believed we had complied. We made a case with the judges what we had produced. There was testimony about what we had produced. And the judges were satisfied with what we produced. I see that I've run out of time. I don't know if the judges had any questions on some of the remaining issues. It doesn't appear so. Thank you. Thank you. All right. Did Mr. Boyce then have any time left? All right. We'll give you two minutes if you need it. Thank you. I'll be very brief. With regard to the issue about the devotional category and the judges arriving at the decision they did, I want to point something out. When you have a piece of evidence, sometimes there's an objection. Sometimes the objection is not admissible. Sometimes it's admissible, but it's of limited weight. By analogy, let's remember, that's what happened with the IPG methodology in the devotional category. The judges did not make the IPG methodology inadmissible. Yes, they had a lot of criticisms of it. I'd also point out they also recognized that it has some qualities, and that because of those qualities, they, in their decision, said, well, they brought up a good point here. They focused on something good there. So it's not like the judges had nothing of IPG's methodology. They just had criticisms of it. So it goes to what weight they were going to give that methodology. It wasn't a situation in which it was excluded. So when we look to the judge's decision, it's not a situation where the words thrown out were used, and that's what triggered this in my mind. That IPG methodology, it was not thrown out. It was heavily criticized, but it was not thrown out, and it was in part, in limited part, embraced. So there was something there for the judges to grab on to. With regard to Judge Miller's questions about the standard on validity of claims, I'm happy that was brought up because there is a standard. Unfortunately, it's a double or triple standard. On the one hand, the MPAA needs to only say, well, we have all these middlemen in contracts with them. As far as the end users, nothing, and that's fine. Did you challenge the validity of those? Yes, we did. Yes, we did. Yeah, that's exactly it. It's in our papers. We've been challenging it the whole time and saying, look, you've got these 4,000-some-odd programs where there's no evidence at all that MPAA has the right to represent or collect money on behalf of those programs. All they have is contracts with middlemen, and that was just brought up. The judges didn't make it. They said, no, we think it's fine. They've got these contracts with the middlemen. That's enough. On the other side of the ledger, for IPG, they practically require a notarized sworn statement under oath. They don't, but, I mean, they put us through the ringer on this, and the MPAA gets this passed. So it's a double standard, I mean, to the point that they even knocked out some claims that weren't even challenged of ours. So it brings up a good point. There's really not a consistent standard. That's why we think the decision in that part was arbitrary and capricious. With regard to the SEC's tardy submission of their methodology, it was said by counsel, this is the first time that's happened. It is, as far as I know, for the very good reason that no one else did it before. In prior proceedings, the MPAA and IPG submitted their methodologies with their written direct statements, and that was not, of course, what the SEC did. It broke from the rule as far as that goes, and that's why what happened happened. With regard to the preliminary claims hearing, one other thing, and it's in our briefs, but we really got, on average, 34 seconds a claim. It was sitting there with a stopwatch. At one point, there was an objection to one of our exhibits that I fought to get in, and we had 10 minutes of argument on the objections, which were then overruled. So no wonder I ran out of time. That was arbitrary and capricious, I believe. What's your answer to their argument that that file that you wanted in discovery just didn't exist? What evidence did you put in before the judges that it actually existed, as opposed to simply being some of those temporary files on a computer? Our expert witness said, necessarily, there must be a file that has the conclusions. There must necessarily have been a calculation at the end that would have done this. Now, at the same time, when you're talking about something that you have not seen, unless you've got someone on the opposing side saying, oh, no, it really exists, you can only go by a certain amount of hypothesis that it must exist, given everything else we know, which is why we're asking the judges, look, like you have before, just issue an order saying you've got to produce everything consistent with the regulation that you read a few minutes ago. That's all we wanted, because who knows? There might have been some other files there, too, that we didn't know about or that we didn't hypothesize existed. That's what should have been done. That's what the judges should have ordered, and for gosh knows what reason, they just didn't. Okay, thank you. Thank you. Mr. McGlean also has no time. All right. We'll also give you two minutes, if you need it. Thank you. First of all, I want to correct a mistake by the CRB's counsel. There was no agreement in the allocations for any year. In the year 2000, we requested an allocation to IPG. I'll say this to be simple in terms of allocation to IPG. We requested an allocation to IPG of 33.5%. The board's ruling was 37.14%, a difference of almost 4%, more than 10% of the allocation that IPG got in that year. Now, it is true in the year 2000 that Dr. Brown, in his rebuttal testimony, which was admitted in evidence at Appendix 3843 to 3846, testified to a zone of reasonableness in the year 2000, and IPG's request of methodology was within that zone of reasonableness, but it was below what we requested for within the zone of reasonableness. Well, I think that's what the government was explaining. It's certainly clear from the brief. Yes, Your Honor. I just wanted to make sure it's clear. We never agreed to any of these. I understand that, but it was within that zone of reasonableness. That was the theory, and then you have your arguments as to why that didn't work for that year and especially why it didn't work for the other years. I understand that. Yes, Your Honor, and obviously with respect to all the other years, they lack even that degree of argument. But they only get there by considering the rebuttal testimony of Dr. William Brown, where we establish our methodology, which was admitted into evidence. The Board doesn't provide any response why it failed to consider that evidence that was before it, and as this Court ruled in Christian Broadcasting Network v. Clavier at Roscoe Tribunal, it is certainly the Tribunal's obligation to consider all legally cognizable evidence placed before it by the parties. But even if you ignore that evidence, it doesn't get around their problem from the intercollegiate case. Rational decision-making requires more than an absence of contrary evidence. I also want to point out there was no surprise here. Dr. Brown testified in his written direct statement that we would rely on viewership as a measure of value. Well, it's not a methodology. It's not putting methodology in. It's just saying here's what we would do if we were going to have to show you something, but we're not showing you something. Your Honor, this is actually consistent with this Court's decision in the NAB v. Clavier at Roscoe Tribunal 1982 decision, in which the Board considered for the first time methodologies presented on rebuttal. And this Court, in upholding that, pointed out many of the relevant criteria were obvious, those criteria being harm to copyright owners, benefit to CSOs, marketplace value, quality, and time-related considerations, not methodologies, but rather the criteria. We did present that criteria. Now, the Board said, based on no evidence whatsoever, IPG was prejudiced by not having our calculations until 21 days before the hearing. IPG's counsel just said they were able to replicate NPAA's methodology within just one week. And NPAA's methodology was by far a more complex and sophisticated methodology than ours. There's no evidence to support the Board's finding of prejudice here. And IPG never asked for more time to do anything. And finally, as we've – and for those reasons, Mr. Witt's testimony should have been admitted. But regardless of whether Mr. Witt's testimony should have been admitted or not, Dr. Brown's testimony was admitted and was ignored. And regardless of whether Dr. Brown's testimony could properly have been ignored, we say it could not. There is no substantial evidence or agreement to support the CRB's decision in the devotional category. I'd just like to – I see I'm out of time. Thank you. Thank you. Thank you. The case will be submitted.
judges: Brown, Kavanaugh, Millett